1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JAMES ALLEN YORK,

11               Petitioner,              No. 2:05-cv-1476 JAM KJN P

12        vs.

13   TERESA A. SCHWARTZ, Warden,

14               Respondent.         FINDINGS AND RECOMMENDATIONS

15   _____/

16          Petitioner is a state prisoner proceeding without counsel with an application for a

17   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2001 conviction on

18   charges of first degree burglary.  (Reporter's Transcript ("RT") 518-21.)  Petitioner admitted a

19   prior conviction for a serious felony.  (RT 527-40.)  Petitioner was sentenced to thirteen years in

20   state prison on June 4, 2001.  (RT 552.)  Petitioner raises three claims in his petition.  (Dkt. No.

21   1.)

22                         PROCEDURAL HISTORY

23          Petitioner filed a timely appeal which was denied on January 9, 2003.  (Resp't's

24   Lodged Document ("LD") 6.)  Petitioner filed a petition for review in the California Supreme

25   Court which was denied on March 26, 2003.  (LD 7.)

26          Petitioner filed habeas petitions in the San Joaquin County Superior Court, the

1   California Court of Appeal, and the California Supreme Court, all of which were denied.  (LD 8-

2   13.)

3             The instant petition was filed on July 22, 2005.  Respondent's answer was filed on

4   August 31, 2005.  Petitioner filed a traverse on October 3, 2005.

5                                        FACTS[1]

6        On the night of January 21, 2000, while Mayra Montes and Mark
Mann-Korner were at dinner, their home was burglarized. A video
7   cassette recorder, lunch box, Bible, two stereos, a large duffel bag,
a personal hygiene kit, compact discs, children's videos, and a Sega
8   game system were missing.

9        A kitchen window was broken and a large piece of glass from
that window was found by Officer Joel Petty.  Petty lifted two
10   latent fingerprints from this piece of glass, which were later
identified as [petitioner's].  Petty did not take the glass with him.

11

12        [Petitioner] had been to the Montes home a few days before the
burglary, trying to sell children's videos.  [Petitioner] and another
man were seen near the home around the time of the burglary.  The
13   day after the burglary, [petitioner] bragged about having taken a
Bible during a burglary.

14

15        Detective Michael Vieira investigated the case.  He sent an
e-mail to other officers indicating he needed to speak with
16   [petitioner] about the burglary.  The e-mail requested officers who
might see [petitioner] to ask him if he had ever been at the Montes
residence; the e-mail further indicated that if [petitioner] denied
17   being at the residence, there was probable cause to arrest him.

18        At approximately 2:00 a.m. on March 3, 2000, Officer Mark
Duxbury saw [petitioner] riding his bicycle and asked [petitioner]
19   if he could speak with him. [Petitioner] stopped his bike on the
sidewalk.  Duxbury informed [petitioner] that Detective Vieira
20   needed to ask him some questions regarding a case.  Because he
was working on another case and had a suspect in his car, Duxbury
21   radioed dispatch that he needed an officer to come question
[petitioner].

22

23        Officer Steve Beukelman responded to Duxbury's call.
Beukelman asked [petitioner] if he had ever been to the Montes
residence and [petitioner] responded he had not.  After this denial,

24

25         [1] The facts are taken from the opinion of the California Court of Appeal for the Third
Appellate District in <u>People v. York</u>, No. C038550 (January 9, 2003), a copy of which was
26   lodged by Respondent as Appendix A to LD 6 on August 31, 2005.

[petitioner] was placed under arrest and taken to the police station.

At trial, the prosecution and defense presented expert witnesses on the fingerprint evidence. Both experts agreed the fingerprints in exhibits 3 and 4 belonged to [petitioner]. The defense challenged the reliability of the fingerprint evidence based on differences in the quality of the prints, including striations and black marks in the fingerprint on exhibit 4 that did not appear in the fingerprint on exhibit 3, and differences in shading between the two prints. These differences caused the defense expert to question whether the prints had actually been taken from the same surface.

Donna Mambretti, the prosecution's fingerprint expert, testified that based on the clarity of the two prints she believed they were taken from a smooth surface. She opined the lines on exhibit 4 could have come from fractures in the glass and the spots from anything damp, such as oil or grease, on the surface from which the fingerprint was taken.

Angelo Rienti, the defense fingerprint expert, challenged whether both of these exhibits came from the same glass surface. He opined exhibit 4 came from either a very dirty smooth surface or a rough surface. He disagreed with Mambretti's opinion as to the potential causes of the striations, explaining that scratches or fractures in the glass or a contaminated brush would have caused black lines, not white lines as found in this print. Rienti found Mambretti's conclusions on this point unreasonable. Rienti agreed with Mambretti's conclusions that the spots could have been caused by dried water spots, grease spots, or moisture that appeared on the glass and dried.

Exhibit 4 was also a darker shade than exhibit 3. Mambretti explained this difference could have been caused by the application of more powder to exhibit 4 than to exhibit 3. Rienti disagreed and opined that Mambretti's opinion was not reasonable.

(People v. York, slip op. at 2-4.)

## ANALYSIS

I.  Standards for a Writ of Habeas Corpus

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citation omitted). A federal writ is not available for alleged error in the interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th

1   Cir. 2000); Middleton, 768 F.2d at 1085.  Habeas corpus cannot be used to try state issues de

2   novo.  Milton v. Wainwright, 407 U.S. 371, 377 (1972).

3                This action is governed by the Antiterrorism and Effective Death Penalty Act of

4   1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d

5   1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting

6   habeas corpus relief:

7               An application for a writ of habeas corpus on behalf of a person
             in custody pursuant to the judgment of a State court shall not be
8            granted with respect to any claim that was adjudicated on the
             merits in State court proceedings unless the adjudication of the
9            claim -

10              (1) resulted in a decision that was contrary to, or involved
             an unreasonable application of, clearly established Federal law, as
11           determined by the Supreme Court of the United States; or

12              (2) resulted in a decision that was based on an unreasonable
             determination of the facts in light of the evidence presented in the
13           State court proceeding.

14  28 U.S.C. § 2254(d).  See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v.

15  Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

16              Under section 2254(d)(1), a state court decision is "contrary to" clearly

17  established United States Supreme Court precedents if it applies a rule that contradicts the

18  governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

19  indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

20  result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citation omitted).

21              Under the  "unreasonable application" clause of section 2254(d)(1), a federal

22  habeas court may grant the writ if the state court identifies the correct governing legal principle

23  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

24  prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

25  simply because that court concludes in its independent judgment that the relevant state-court

26  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

1  application must also be unreasonable."  Id. at 412;  see also Lockyer v. Andrade, 538 U.S. 63, 75

2  (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

3  question, is left with a 'firm conviction' that the state court was 'erroneous.'")

4      The court looks to the last reasoned state court decision as the basis for the state

5  court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where, as here, the

6  state court reaches a decision on the merits but provides no reasoning to support its conclusion, a

7  federal habeas court independently reviews the record to determine whether habeas corpus relief

8  is available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003);

9  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000) ("Independent review of the record is not de

10 novo review of the constitutional issue, but rather, the only method by which we can determine

11 whether a silent state court decision is objectively unreasonable.");  accord Pirtle v. Morgan, 313

12 F.3d 1160, 1167 (9th Cir. 2002).  When it is clear that a state court has not reached the merits of

13 a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's deferential

14 standard does not apply and a federal habeas court must review the claim de novo.  Nulph v.

15 Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle, 313 F.3d at 1167.

16 II.  Petitioner's Claims

17      A.  Miranda Error

18      Petitioner's first claim is that admission of petitioner's statement to Officer

19 Beukelman without prior Miranda[2] advisement violated petitioner's Fifth Amendment rights.

20      Petitioner claims that he was "in custody" during the interview with Detective

21 Beukelman and that he should have been given Miranda warnings.  Petitioner argues that a

22 reasonable person in petitioner's position would have believed his freedom of movement was

23 restrained.  Petitioner was riding his bicycle on the sidewalk at 2:00 a.m. and was hailed by a

24 _____

25      [2]  In Miranda v. Arizona, the United States Supreme Court held that custodial
   interrogation must be preceded by advice to the potential defendant that he has the right to
   consult with a lawyer, the right to remain silent and that anything he says can be used in evidence
26 against him.  Id., 384 U.S. 436, 469-73 (1966).

uniformed police officer standing in front of a marked police car.  The officer requested

petitioner stop and get off his bicycle.  Petitioner notes the area was isolated with three officers

and three patrol cars nearby.  Petitioner contends that the fact that he had to wait with Officer

Duxbury until Detective Beukelman arrived also demonstrates he was not free to leave, and

conveyed to petitioner their subjective intent to arrest petitioner.

　　　　　The last reasoned rejection of this claim is the decision of the California Court of

Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed

this claim as follows:

> [Petitioner] contends the trial court erred in denying his *Miranda* motion to suppress his statement to Officer Beukelman denying he had ever been in the Montes home.
>
> As a result of Detective Vieira's e-mail requesting officers to ask [petitioner] about his presence at the Montes residence, Officer Duxbury asked [petitioner] to stop.  Before contacting [petitioner], and because he had a suspect on a different matter in custody, Duxbury requested another officer be dispatched to the scene.  Officer Beukelman responded from about a block away and was at the scene in less than a minute.  Beukelman asked [petitioner] if he had ever been to the Montes home, to which [petitioner] responded he had not.  [Petitioner] was not restrained, he was not handcuffed, he was not told he could not leave, and he did not attempt to leave.
>
> In denying the motion, the trial court specifically found "this was the investigatory stage of the proceedings.  The [petitioner] was not in custody."  We agree with the trial court's ruling.
>
> The applicability of *Miranda* depends upon a finding that [petitioner] was subjected to custodial interrogation.  (*People v. Mayfield* (1997) 14 Cal.4th 668, 732-733, 60 Cal.Rptr.2d 1, 928 P.2d 485.)  In the absence of a custodial interrogation, *Miranda* does not come into play.  (*People v. Mickey* (1991) 54 Cal.3d 612, 648, 286 Cal.Rptr. 801, 818 P.2d 84.)
>
> "Custodial interrogation" occurs when a law enforcement officer questions a suspect after placing him or her under formal arrest, or after restraining the suspect's freedom of movement to the degree associated with a formal arrest.  (*California v. Beheler* (1983) 463 U.S. 1121, 1123-1125 [77 L.Ed.2d 1275, 1277-1279]; *People v. Boyer* (1989) 48 Cal.3d 247, 271, 256 Cal.Rptr. 96, 768 P.2d 610 (*Boyer*), disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1, 38 Cal.Rptr.2d 394, 889 P.2d 588.)  "Where no formal arrest takes place, the relevant inquiry ...

'is how a reasonable man in the suspect's position would have understood his situation....' " (*Boyer, supra,* 48 Cal.3d at p. 272, 256 Cal.Rptr. 96, 768 P.2d 610.)  The test does not depend on the subjective view of the officer or the person being questioned. (*Stansbury v. California* (1994) 511 U.S. 318, 325 [128 L.Ed.2d 293, 300].)

"Whether custody has occurred short of a formal arrest depends upon the totality of the circumstances, including such factors as: (1) the site of the interrogation; (2) whether the investigation has focused on the suspect; (3) whether the indicia of arrest are present; and (4) the length and form of the questioning." (*People v. Morris* (1991) 53 Cal.3d 152, 197, 279 Cal.Rptr. 720, 807 P.2d 949 (*Morris*), disapproved on another point in *People v. Stansbury, supra,* 9 Cal.4th at p. 830, fn. 1, 38 Cal.Rptr.2d 394, 889 P.2d 588.)

"No one factor is dispositive.  Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162, 59 Cal.Rptr.2d 587.)

"Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime.  But police officers are not required to administer *Miranda* warnings to everyone whom they question.  Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.  *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'  It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited ." (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495 [50 L.Ed.2d 714, 719] (*Mathiason*).)

Here, the encounter between [petitioner] and police did not take place in a jail or on police premises; it took place on a public street near [petitioner's] home.  The questioning was brief, lasting only a few minutes, and nonaccusatory, one yes-or-no question.  It was not accompanied by the traditional indicia of arrest; [petitioner] was in no way physically restrained or directed to say or do anything.  (See *Morris, supra,* 53 Cal.3d at pp. 197-198, 279 Cal.Rptr. 720, 807 P.2d 949.)  Under well established custodial interrogation jurisprudence, these facts are sufficient to establish the interaction was noncustodial.  (See *Mathiason, supra,* 429 U.S. at p. 495 [50 L.Ed.2d at p. 719]; *Morris, supra,* 53 Cal.3d at pp. 196-198, 279 Cal.Rptr. 720, 807 P.2d 949; *People v. Robertson*

7

1   (1982) 33 Cal.3d 21, 38, 188 Cal.Rptr. 77, 655 P.2d 279; *People v.*
    *Mosley* (1999) 73 Cal.App.4th 1081, 1089-1091, 87 Cal.Rptr.2d
2   325; *People v. Lopez* (1985) 163 Cal.App.3d 602, 608-609, 209
    Cal.Rptr. 575.)  Accordingly, it was not error to deny [petitioner's]
3   motion to suppress his statement.

4   People v. York, slip op. at 5-8.

5          In Miranda v. Arizona, 384 U.S. 436 (1966), the United States Supreme Court

6   held that the Fifth Amendment privilege against self-incrimination prohibits the admission into

7   evidence of statements given by a suspect during "custodial interrogation" without a prior

8   warning. Id. at 444.  Custodial interrogation means "questioning initiated by law enforcement

9   officers after a person has been taken into custody or otherwise deprived of his freedom of action

10  in any significant way." Id.  Whether a suspect is "in custody" for purposes of Miranda requires

11  application of an objective test.  Yarborough v. Alvarado, 541 U.S. 652, 662-63 (2004).  Two

12  inquiries are necessary for a determination of an individual's "in custody" status: (1) the overall

13  circumstances surrounding the interrogation; and (2) given those circumstances, whether a

14  reasonable person in the suspect's situation would have felt free to terminate the interrogation

15  and leave.  Id.; Thompson v. Keohane, 516 U.S. 99, 112 (1995); see also Stansbury v. California,

16  511 U.S. 318, 322 (1994) ("the ultimate inquiry is simply whether there [was] a formal arrest or

17  restraint on freedom of movement of the degree associated with a formal arrest") (quoting

18  California v. Beheler, 463 U.S. 1121, 1125 (1983)); Berkemer v. McCarty, 468 U.S. 420, 442

19  (1984) (custody must be determined based on a how a reasonable person in the suspect's situation

20  would perceive his circumstances and "[a] policeman's unarticulated plan has no bearing on the

21  question whether a suspect was 'in custody' at a particular time").  The protections provided by

22  Miranda attach only when an individual is both in custody and being interrogated.  See McNeil v.

23  Wisconsin, 501 U.S. 171, 182 n.3 (1991) ("We have in fact never held that a person can invoke

24  his Miranda rights anticipatorily, in a context other than 'custodial interrogation'. . . .").

25         The question before this court is whether the state courts' adjudication of the

26  Miranda issue raised by petitioner "involved an unreasonable application" of clearly established

8

federal law when the state court concluded that petitioner was not in custody when he was

questioned by Detective Beukelman.  28 U.S.C. § 2254(d)(1).  Under this standard, petitioner is

not entitled to federal habeas relief.

Prior to contacting petitioner, Officer Duxbury made a radio broadcast indicating

he had petitioner on 4th Street west of West Street.  (RT 15.)  Officer Duxbury called out

petitioner's name and asked to talk to him.  (RT 13.)  Petitioner stopped riding his bicycle on the

sidewalk.  (RT 13.)  Officer Duxbury asked petitioner if he had been contacted by Detective

Vierra.  (RT 14.)  Petitioner responded no, and Officer Duxbury told petitioner he needed to ask

him some questions regarding a case.  (RT 14.)

Detective Beukelman arrived in less than a minute (he was about a block away).

(RT 199.)  Petitioner was talking to Officer Duxbury when Detective Beukelman arrived.  (RT

200.)  Detective Beukelman asked petitioner whether he had ever been to 144 8th Street;

petitioner responded, "no."  (RT 200.)  Petitioner was not restrained in any way.  (RT 200.)  Only

a few minutes passed between the time Detective Beukelman arrived and petitioner responded to

the question.  (RT 201.)  Detective Beukelman testified that Officer Petty was present, Sgt. Farr

was sitting in his patrol car, and Officer Duxbury left the scene to return to the station.  (RT 202.)

Petitioner testified he was riding his bicycle near his home at the time Officer

Duxbury called to him.  (RT 204.)  Petitioner testified that after Detective Beukelman asked him

whether he had been to 144 8th Street, Officer Petty took petitioner's bicycle to petitioner's

home.  (RT 205-06.)  Detective Beukelman grabbed petitioner by the arm and led him to the

patrol car.  (RT 212.)  Petitioner stated he did not try to leave.  (RT 213.)  Petitioner testified that

he had to stop because the police officer asked him to—"[i]t wasn't no time of talking about

leaving." (RT 213.)

The trial court denied the <u>Miranda</u> motion as follows:

> We have the testimony by Officer Duxbury that he saw
> [petitioner].  He knew that another officer wanted to ask some
> questions of [petitioner] and he said he asked if he could speak to

1  him.  [Petitioner] stopped.  [Petitioner] asked what it was about
2  and then Officer Duxbury testified he did not tell him to stop.  I do
   not find that there was submission to authority.  The question here
3  was, was it custodia[l] interrogation and questioning designed to
   elicit an incriminating response which would trigger *Miranda*.  I
4  find this was the investigatory stage of the proceedings.
   [Petitioner] was not in custody.  There was no probable cause to
5  arrest.  There was a question that they wanted to ask, and I do not
   find that *Miranda* was required here.

6  (RT 218.)

7       Although the officer may have believed that petitioner was involved in the

8  burglary, this fact is irrelevant to the question of whether petitioner believed he was in custody.

9  See Berkemer, 468 U.S. at 442 (although the interrogating officer reached the decision to arrest

10 the driver at the beginning of the traffic stop, the driver was not "in custody" for purposes of

11 Miranda because the officer did not communicate that intent to the driver);  Stansbury, 511 U.S.

12 at 323 (explaining that "the initial determination of custody depends on the objective

13 circumstances of the interrogation, not on the subjective views harbored by either the

14 interrogating officers or the person being questioned"); United States v. Kim, 292 F.3d 969, 973

15 (9th Cir. 2002) ("The ['in custody'] inquiry focuses on the objective circumstances of the

16 interrogation, not the subjective views of the officers or the individual being questioned.")

17      Contrary to petitioner's argument, the mere fact that the interview took place on a

18 city street at 2:00 a.m., or that an officer suggested petitioner was involved in a burglary, did not

19 render the interrogation "custodial."  See Mathiason, 429 U.S. at 495 (a non-custodial

20 interrogation "is not converted to one in which Miranda applies" simply because the questioning

21 took place at the police station); Stansbury, 511 U.S. at 325 ("even a clear statement from an

22 officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the

23 custody issue, for some suspects are free to come and go until the police decide to make an

24 arrest").  As noted by the state court, review of the circumstances here support the state court's

25 finding that petitioner was not subjected to custodial interrogation.  The encounter took place on

26 a public street near petitioner's home; the questioning consisted of one yes-or-no question; the

10

1   encounter lasted only a few minutes, and was not accusatory; and petitioner was not physically

2   restrained.  Thus, the state court's rejection of petitioner's first claim for relief was neither

3   contrary to, nor an unreasonable application of, controlling principles of United States Supreme

4   Court precedent.  Accordingly, petitioner's first claim for relief should be denied.

5          B.  <u>Prosecutorial Misconduct</u>

6          Petitioner's second claim is that during closing argument, the prosecution

7   committed misconduct by improperly vouching for Officer Petty and by intentionally misstating

8   the testimony of defense expert Rienti.

9          The last reasoned rejection of this claim is the decision of the California Court of

10  Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed

11  this claim as follows:

12          First, [petitioner] claims "[t]he prosecutor improperly vouched
        for [O]fficer Petty." The alleged improper vouching consisted of
13      two statements.  At one point in his closing argument, the
        prosecutor declared, "Officer Petty was aware of the consequences
14      should he even consider falsifying evidence. Termination.
        Prosecution."  At another point, the prosecutor stated, "That people
15      would jeopardize their careers, their positions, their integrity to
        wrongfully convict an individual.  Where is the evidence of that?"
16
17          Initially, we note there was no objection to the prosecutor's
        remarks about Officer Petty; thus, [petitioner] has waived this
18      objection on appeal.  (*People v. Hill* (1998) 17 Cal.4th 800, 820, 72
        Cal.Rptr.2d 656, 952 P.2d 673.)

19          In any event, we disagree with the claim.  A prosecutor is
        precluded from vouching for the credibility of prosecution
20      witnesses or from bolstering their credibility by referring to
        evidence outside the record.  (*People v. Frye* (1998) 18 Cal.4th
21      894, 971, 77 Cal.Rptr.2d 25, 959 P.2d 183 (*Frye*).)  However, as
        long as a prosecutor's assurances regarding the reliability of
22      prosecution witnesses are based upon facts in the record and
        inferences reasonably drawn therefrom, rather than any purported
23      personal knowledge or belief, the prosecutor's comments are not
        improper vouching.  (*Ibid*.)
24
25          The prosecutor's comments here fairly summarized Officer
        Petty's testimony and characterized his demeanor while testifying.
26      This was not improper vouching.  "[W]e do not believe that the
        prosecutor's remarks, viewed singly or in context, could reasonably

have been interpreted as a personal endorsement of [Petty]....
Accordingly, we discern no impropriety." (*People v. Fierro* (1991)
1 Cal.4th 173, 211, 3 Cal.Rptr.2d 426, 821 P.2d 1302.)

Next, [petitioner] contends the prosecutor "grossly and
intentionally misstated the testimony of defense expert Rienti."  He
cites two specific instances of such misstatement.

First, with respect to Rienti's testimony regarding the
compensation he received for working on [petitioner's] case, the
prosecutor argued that Rienti frequently overstated himself in
expressing his opinion. As one in a long line of examples of such
overstatement, the prosecutor argued, "Let's talk about his
compensation.  He was asked how much he was being paid to
testify in this case.  He told you he had been paid a thousand
dollars.  Is that all you are going to be paid?  Well, no.  I am
actually going to be paid more.... [¶] ... [¶]  He told you at first he
had been paid a thousand dollars.  But in further questioning he
told you 460 more plus traveling....  He would be paid over $1500.
He misrepresented to you his compensation to you by 50 percent."

The trouble here is Rienti was not asked how much he was being
paid, but rather, how much he had been paid.  He clarified, "So
far?," which the prosecutor confirmed.  Rienti testified he had been
paid $1,000 so far and, upon further questioning, that he expected
to be paid approximately an additional $500 by the end of the case.
The prosecutor's statement therefore was an inaccurate
characterization of Rienti's testimony.

Second, [petitioner] complains that the prosecutor misstated
Rienti's testimony concerning Mambretti's opinions.  The
prosecutor argued that Rienti had "confirmed that Donna
Mambretti's opinions were within the range, an acceptable range of
points on that opinion, even though he disagreed with her points,
but he validated her opinions."  Upon objection, the prosecutor
restated his argument:  "He acknowledged that the opinions that
she expressed was [sic] a proper opinion based on the facts in this
case."

Rienti did agree with some of Mambretti's opinions.  He agreed
the fingerprints were [petitioner's]; that the black spots on exhibit
4 could have been caused by dried water spots, grease spots, or
moisture on the surface; and that exhibit 4 could have been lifted
from a smooth surface, albeit a very dirty one.  However, he
strongly disagreed about the potential causes of the line striations
and darker shading in exhibit 4.  On these latter two points, he
remained consistent that Mambretti's opinions were not reasonable.

We do not believe these comments amount to prejudicial
misconduct.  To show prejudicial prosecutorial misconduct
compelling reversal, a defendant must show a reasonable

likelihood the jury understood or applied the statements in an improper or erroneous manner. (*Frye* (1998) 18 Cal.4th 894, 970, 77 Cal.Rptr.2d 25, 959 P.2d 183; *People v. Sanders* (1995) 11 Cal.4th 475, 526, 46 Cal.Rptr.2d 751, 905 P.2d 420.) We must consider the statements in the context of the prosecutor's entire argument (*People v. Dennis* (1998) 17 Cal.4th 468, 522, 71 Cal.Rptr.2d 680, 950 P.2d 1035; *People v. Lucas* (1995) 12 Cal.4th 415, 475, 48 Cal.Rptr.2d 525, 907 P.2d 373) and may not "'lightly infer'" that the jury drew the most damaging rather than the least damaging meaning from [those] statements. (*Frye, supra,* 18 Cal.4th at p. 970, 77 Cal.Rptr.2d 25, 959 P.2d 183.) Assuming that these two instances amount to prosecutorial misconduct, in the context of the entire argument we conclude it is not a proper basis for reversing [petitioner's] conviction. (See *People v. Osband* (1996) 13 Cal.4th 622, 695, 55 Cal.Rptr.2d 26, 919 P.2d 640.)

(People v. York, slip op. at 8-11.)

A criminal defendant's due process rights are violated when a prosecutor's misconduct renders a trial fundamentally unfair. Darden v. Wainwright, 477 U.S. 168, 181 (1986); Sassounian v. Roe, 230 F.3d 1097, 1106 (9th Cir. 2000). Claims of prosecutorial misconduct are reviewed "'on the merits, examining the entire proceedings to determine whether the prosecutor's [actions] so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995) (citation omitted). Relief on such claims is limited to cases in which the petitioner can establish that prosecutorial misconduct resulted in actual prejudice. Johnson, 63 F.3d at 930 (citation omitted).

In considering claims of prosecutorial misconduct involving allegations of improper argument, the court is to examine the likely effect of the statements in the context in which they were made and determine whether the comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. Turner v. Calderon, 281 F.3d 851, 868 (9th Cir. 2002). Thus, in order to determine whether a prosecutor engaged in misconduct during closing argument, it is necessary to examine the entire proceedings to place the remarks in context. See United States v. Robinson, 485 U.S. 25, 33 (1988) ("prosecutorial comment must be examined in context. . . ").

"It is improper for the prosecution to vouch for the credibility of a government

witness.  Vouching may occur in two ways:  the prosecution may place the prestige of the

government behind the witness or may indicate that information not presented to the jury

supports the witness's testimony."  <u>United States v. Roberts</u>, 618 F. 2d 530, 533 (9th Cir. 1980);

<u>see also</u> <u>United States v. Young</u>, 470 U.S. 1, 18 (1985); <u>United States v. Garcia-Guizar</u>, 160 F.3d

511, 520 (9th Cir. 1998).  "The first type of vouching involves personal assurances of a witness's

veracity."  <u>United States v. Roberts</u>, 618 F. 2d at 533.  "The second type of vouching involves

prosecutorial remarks that bolster a witness's credibility by reference to matters outside the

record."  <u>Id</u>.  However, "[t]o warrant habeas relief, prosecutorial vouching must so infect the trial

with unfairness as to make the resulting conviction a denial of due process."  <u>Davis v. Woodford</u>,

384 F.3d 628, 644 (9th Cir. 2004) (citation and internal quotation omitted).

i. <u>Improper Vouching</u>

Petitioner contends that the prosecutor improperly vouched for Officer Petty on

two separate occasions.  First, during closing argument, the prosecutor stated "Officer Petty was

aware of the consequences should he even consider falsifying evidence.  Termination.

Prosecution."  (Pet. at 13.)  Second, during rebuttal closing argument, the prosecutor stated

"[t]hat people would jeopardize their careers, their positions, their integrity to wrongfully convict

an individual.  Where is the evidence of that?"  (Pet. at 13.)

Review of the entirety of the prosecutor's comments, taken in context,

demonstrate that the prosecutor was fairly arguing from the evidence presented.  Officer Petty

testified as to reasons why he would not falsify evidence.  (RT 246-47.)  The prosecutor properly

could argue the evidence permitted the inference that Petty was credible.  <u>See</u> <u>United States v.</u>

<u>Necoechea</u>, 986 F.2d 1273, 1279 (9th Cir. 1993) (prosecutor's argument that witness told the

truth because if she were lying she would have done a better job, was not vouching, but rather

permissible argument of inference from evidence).  Here, the prosecutor's arguments were fairly

based on the evidence and do not constitute improper vouching.  The prosecutor was not placing

the prestige of the government behind his truthfulness, and did not suggest he knew facts outside

14

the record.  Rather, he was arguing that, based on the evidence, the jury could properly accept Petty's testimony.  There is no constitutional error arising from these comments in closing argument.

But even assuming, arguendo, the prosecutor's comments were improper, the jury was instructed that attorneys' statements are not evidence.  (RT 485.)  The jury was also specifically instructed on witness credibility.  (RT 489-90.)  These instructions made clear to the jury that the prosecutor's comments were argument, not evidence.  Moreover, there is no evidence that any vouching so infected the trial with unfairness as to make the resulting conviction a denial of due process.  Davis, 384 F.3d at 644.

## ii.  Misstated Testimony

Petitioner also contends that the prosecutor intentionally misstated the testimony of defense expert Rienti.  The record reflects the following:

During trial, the prosecutor asked Rienti how much he had been paid to testify for the defense, Rienti responded by asking, "So far?"  (RT 368.)  Rienti then responded, "About a thousand dollars."  (RT 368.)  After further questioning, Rienti admitted he expected to receive a total of $1,530.00.  (RT 368.)

During closing argument, the prosecutor stated:

Let's talk about [Rienti's] compensation.  He was asked how much he was paid to testify in this case.  He told you he had been paid a thousand dollars.  Is that all you are going to be paid?  Well, no.  I am actually going to be paid more.  I am going to be paid $470 more plus travel expenses.  He was really going to be paid in excess of $1500.

[¶] . . . [¶]

He told you at first he had been paid a thousand dollars.  But in further questioning he told you $460 more plus traveling which would be 50 or $60 more.  He would be paid over $1500.  He misrepresented to you his compensation to you by 50 percent.  That is substantial.

(RT 473.)  Defense counsel objected, but the trial court overruled the objection, stating the jury is

15

to decide the facts.  (RT 473.)

The record demonstrates there is no basis to suggest that the prosecutor misstated the evidence.  Rather, the prosecutor merely argued inferences consistent with the evidence adduced at trial.  Because the prosecutor properly argued inferences from evidence adduced at trial, there was no prosecutorial misconduct, and this claim should be denied.

Finally, petitioner contends the prosecutor (Mr. Green) misstated Rienti's testimony regarding prosecution expert witness Mambretti's opinions.  During trial, the prosecutor attempted to reconcile, unsuccessfully, Rienti's opinion with Mambretti's.  (RT 371-77.)  Petitioner argues that the prosecutor's closing argument, in light of the expert's testimony, was an intentional misstatement made to improperly influence the jury.  During closing argument, the record reflects the following:

> MR. GREEN:  Remember [Rienti's] opinion it was possible 3 and 4 were from the same surface.  That is his testimony.  It is possible they were from the same surface.  He was sure that People's 3 came from a smooth surface.  He also confirmed that Donna Mambretti's opinions were within the range, an acceptable range of points on that opinion, even though he disagreed with her points, but he validated her opinions.
>
> MR. KOWALSKI:  Objection.  Misstates the opinion.
>
> THE COURT:  Maybe "validated," you might use a different term.
>
> MR. GREEN:  He acknowledged that the opinions that she expressed was a proper opinion based on the facts in this case.  That was his testimony.  "Validations," I don't know.  Poor choice of words possibly.
>
> And, again, he talked about high points would leave white lines.  Probably the most likely explanation of white lines are the stress fractures since we are dealing with a broken piece of glass.  So that is Mr. Rienti's testimony.  I think it is highly questionable.  You evaluate it.  You give it the credibility you feel it deserves.

(RT 475.)

However, as noted by the state court, Rienti agreed with some of Mambretti's opinions.  (RT 379-80.)  Specifically, he agreed the fingerprints were petitioner's.  Moreover, on

re-cross, Rienti confirmed that two experts could have different opinions about an issue without either one being a liar.  (RT 388.)  In light of the entire proceedings, this court cannot find that the prosecutor's comments concerning Rienti's opinion infected the trial with unfairness such that it violated due process.  Indeed, the prosecutor reminded the jury it must evaluate Rienti's testimony on its own.  And, as noted above, the jury was properly instructed as to the nature of the attorneys' arguments and as to how to evaluate the credibility of witnesses.  Thus, this court cannot find that the state court's rejection of petitioner's second claim for relief was contrary to, or an unreasonable application of, controlling principles of United States Supreme Court precedent.  Petitioner's second claim for relief should be denied.

C.  Cumulative Error

Petitioner's third claim is that the cumulative effect of the errors alleged herein constitute a denial of due process.

The Ninth Circuit has concluded that under clearly established United States Supreme Court precedent the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal.  Parle v. Runnels, 505 F.3d 922, 927 (9th. Cir. 2007) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974), and Chambers v. Mississippi, 410 U.S. 284, 290 (1973)).  "The fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense 'far less persuasive,' Chambers, 410 U.S. at 294, and thereby had a 'substantial and injurious effect or influence' on the jury's verdict."  Parle, 505 F.3d at 927 (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).  See also Hein v. Sullivan, 2010 WL 1427588, *15 (9th Cir. 2010) (same).

This court has addressed each of petitioner's claims and has concluded that no error of constitutional magnitude occurred.  This court also concludes that the alleged errors, even when considered together, did not render petitioner's defense "far less persuasive," nor did

1    they have a "substantial and injurious effect or influence on the jury's verdict."  Accordingly,

2    petitioner is not entitled to relief on his claim of cumulative error.

3    III.  Conclusion

4            For all of the above reasons, the undersigned recommends that petitioner's

5    application for a writ of habeas corpus be denied.  If petitioner files objections, he shall also

6    address whether a certificate of appealability should issue and, if so, why and as to which issues.

7    A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a

8    substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).

9            Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

10   writ of habeas corpus be denied.

11           These findings and recommendations are submitted to the United States District

12   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

13   one days after being served with these findings and recommendations, any party may file written

14   objections with the court and serve a copy on all parties.  Such a document should be captioned

15   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

16   objections shall be filed and served within fourteen days after service of the objections.  The

17   parties are advised that failure to file objections within the specified time may waive the right to

18   appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

19   DATED:  August 31, 2010

20

21

22                                              KENDALL J. NEWMAN

23                                              UNITED STATES MAGISTRATE JUDGE

24   york1476.157

25

26

18